# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

January 18, 2013

To:   Laura A. Briggs
UNITED STATES DISTRICT COURT
Southern District of Indiana
30 N. Seventh Street
Terre Haute , IN 47808-0000

| | |
|---|---|
| No.: 11-3321 | UNITED STATES OF AMERICA, <br> Plaintiff - Appellee <br><br> v. <br><br> MICHAEL D. WEIR, <br> Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 2:10-cr-00007-JMS-CMM-27 <br> Southern District of Indiana, Terre Haute Division <br> District Judge Jane E. Magnus-Stinson |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:        No record to be returned

This notice sent to:

[]      United States Marshal      [x]      United States Probation Officer

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                             **Received by:**

      1/18/13                     *Theresa M. Amato*

_____

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

CERTIFIED COPY
A True Copy
Teste:

~~[signature]~~

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

December 3, 2012

Before:

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| Nos.: 11-2546, 11-2552, 11-2632, 11-2633, 11-2696, 11-3146, 11-3319, 11-3321 & 11-3367 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>JWUAN L. MORELAND, ANTRIO D. HAMMOND, WESLEY S. HAMMOND, SUSIE A. SMITH, HERBERT D. PHIPPS, DAVID J. PITTS, BRADLEY S. SHELTON, MICHAEL D. WEIR and TIMOTHY BAILEY,<br>Defendants - Appellants |

**Originating Case Information:**

District Court No: 2:10-cr-00007-JMS-CMM
Southern District of Indiana, Terre Haute Division
District Judge Jane E. Magnus-Stinson

The judgments of the District Court are **AFFIRMED**, in accordance with the decision of this court entered on this date.

In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
11-3146, 11-3319, 11-3321, 11-3367

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JWUAN L. MORELAND, ANTRIO B. HAMMOND,
WESLEY S. HAMMOND, SUSIE A. SMITH,
HERBERT D. PHIPPS, DAVID J. PITTS,
BRADLEY S. SHELTON, MICHAEL D. WEIR, and
TIMOTHY BAILEY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:10-cr-00007-JMS-CMM-7, -6, -1, -19,
-14, -4, -5, -27, -18—**Jane E. Magnus-Stinson**, *Judge.*

ARGUED SEPTEMBER 28, 2012—DECIDED DECEMBER 3, 2012

Before POSNER, ROVNER, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* The nine defendants were charged with conspiracy to distribute large quantities of methamphetamine and marijuana (two of them were

2            Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                  11-3146, 11-3319, 11-3321, 11-3367

charged in addition with being felons in possession of firearms). All were convicted by a jury and given long prison sentences: Moreland 110 months, Smith 151, Bailey 216, Pitts 420, and the others life. Only one defendant, Shelton, was charged with a substantive drug offense; this is a further illustration, if any is needed, that conspiracy is indeed the prosecutors' darling. We listed the reasons in *United States v. Nunez*, 673 F.3d 661, 662-64 (7th Cir. 2012); see also *Krulewitch v. United States*, 336 U.S. 440, 449, 457 (1949) (Jackson, J., concurring); *United States v. Jones*, 674 F.3d 88, 91 and n. 1 (1st Cir. 2012); *United States v. Boidi*, 568 F.3d 24, 29 (1st Cir. 2009); 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.1(b), pp. 256-65 (2d ed. 2003)—though we add that a prosecutor's putting *all* his eggs in the conspiracy basket can be a risky tactic, as we'll see.

   The details of the conspiracy are not important, so we can proceed to the issues raised by the appellants. We begin with the issues common to all of them. The first concerns the government's use of wiretap evidence. That is permissible only if the government can show that wiretapping was necessary to its investigation because (so far as relates to this case) other investigative methods, such as the use of undercover agents and informants, telephone records, pen registers, trap-and-trace devices, the grand jury, physical searches, and physical surveillance, would not yield essential evidence. 18 U.S.C. § 2518(1)(c). The government argues that without the wiretaps the extent of the conspiracy—28 persons

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,      3
         11-3146, 11-3319, 11-3321, 11-3367

were charged ultimately—could not have been proved
and the leaders, who did not deal face to face with the
government's informants or with the members of the
conspiracy whom the government was able to identify,
could not have been identified. See *United States v. Ceballos*,
302 F.3d 679, 683-84 (7th Cir. 2002); *United States v.
Zambrana*, 841 F.2d 1320, 1331 (7th Cir. 1988); *United States
v. Foy*, 641 F.3d 455, 464-65 (10th Cir. 2011); *United States v.
Becton*, 601 F.3d 588, 596 (D.C. Cir. 2010); *United States v.
Jackson*, 345 F.3d 638, 644-45 (8th Cir. 2003); *United States v.
Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002). The govern-
ment supported its argument with detailed affidavits.
The defendants asked for an evidentiary hearing, but
the judge properly refused because they were unable to
specify any assertion in the government's affidavits
that they could contest with evidence.

   The defendants complain about the judge's having
in advance of voir dire excused several potential jurors
who had notified the court that because of vacation
plans, business commitments, or employment obliga-
tions it would be a hardship for them to serve on a jury
in a case that might take a long time to try. In fact the
trial lasted three weeks. Prospective jurors were told at
the voir dire that it might last as long as five weeks, but
the jurors who before the voir dire asked to be excused
had been told only that they might be summoned for
jury duty at some time during the month in which
they would be on call. See United States District Court
for the Southern District of Indiana, "Federal Jury

4            Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                    11-3146, 11-3319, 11-3321, 11-3367

Service Information: Stage 2: Notice of Jury Service,"
www.insd.uscourts.gov/Jury (visited Oct. 31, 2012).

Federal criminal defendants are entitled to be tried by
a jury "selected at random from a fair cross section of
the community," 28 U.S.C. § 1861, a principle derived
by interpretation of the Sixth Amendment's requirement
of an impartial jury. *Berghuis v. Smith*, 130 S. Ct. 1382,
1387 (2010). The defendants argue that excusing persons
who have vacation plans, business commitments, or
employment demands tilts the jury's composition away
from the more affluent members of the community and so
makes jury selection unrepresentative. One doubts that
criminal defendants actually *want* to be judged by
members of the upper middle class, but in any event,
without some evidence of *systematic* exclusion of some
definable element of society (such as a racial or ethnic
group, but it could also be a group defined by income
or social class), the cross-section argument fails. *Id.* at
1388; *Duren v. Missouri*, 439 U.S. 357, 364-66 (1979);
*United States v. Neighbors*, 590 F.3d 485, 492 (7th Cir.
2009). Otherwise voir dire would become an interminable
sociological inquiry into how closely the social status of
the jury matched that of the adult population as a
whole from which the jurors had been drawn.

The defendants further argue that excluding busy
people from a jury violates the Jury Selection and Service
Act, 28 U.S.C. § 1862, which forbids exclusion from
juries on the basis of "economic status." The concern
appears to have been with exclusion of the poor, H.R. Rep.

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,      5
      11-3146, 11-3319, 11-3321, 11-3367

No. 90-1076, 90th Cong., 2d Sess. (1968), reprinted at 1968 U.S.C.C.A.N. 1792, 1795, which is the opposite of the complaint here; and anyway excusing a prospective juror because of commitments is not exclusion on account of economic status, though there may be a correlation between affluence and commitments that are incompatible with jury duty, depending on the expected length of the trial. In any event, the defendants forfeited the point by failing to comply with the procedures for challenging compliance with the Act. See 28 U.S.C. § 1867; *United States v. Phillips*, 239 F.3d 829, 840-41 (7th Cir. 2001).

The defendants also complain that excusing prospective jurors before the trial violated Fed. R. Crim. P. 43(a)(2), which entitles the defendant to be present "at every trial stage, including jury impanelment." But issuance of jury summonses, submission of responses to those summonses in which the responders asked to be excused, and action on those submissions—all before the jury venire is created and the members of the venire seated in the courtroom when the trial is called—precede jury impanelment. *Gomez v. United States,* 490 U.S. 858, 874 (1989); *United States v. Greer*, 285 F.3d 158, 167-68 (2d Cir. 2002); *Henderson v. Dugger*, 925 F.2d 1309, 1316 (11th Cir. 1991); cf. *Cohen v. Senkowski*, 290 F.3d 485, 490 (2d Cir. 2002). Practicality dictates this conclusion. For what if a recipient of a jury summons replied to the court's jury administrator that he was hospitalized awaiting major surgery? Would the administrator's excusing him from jury service violate Rule 43? Anyway "a

6          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                 11-3146, 11-3319, 11-3321, 11-3367

general qualification of the jury is not a 'critical stage' in
the proceedings. The court was merely deciding which
jurors were to be excused for age, hardship, etc. It is
difficult to see what the defendant could have added to
this proceeding." *Henderson v. Dugger, supra*, 925 F.2d at
1316.

Another issue common to all the defendants involves
expert testimony. A law enforcement officer was
permitted to testify as both a lay witness and an expert
witness, and the defendants complain that this was
improper. The witness, who was the DEA agent in
charge of the investigation of the conspiracy, was
called to testify about the meaning of code words used
in intercepted phone conversations of the defendants—
code words that he had learned the meaning of in the
course of investigating this very drug conspiracy and
code words commonly used in the drug trade that he
had learned the meaning of in other investigations.
About the first type of code word he was testifying from
personal knowledge obtained in the investigation,
and thus as a lay witness, Fed. R. Evid. 701, while about
the second type he was testifying as an expert on drug
codes, his expertise having derived from his involve-
ment in other drug investigations. Fed. R. Evid. 702. From
the investigation in this case he had learned that
the conspirators called methamphetamine "blue" (the
particular methamphetamine distributed by this con-
spiracy was tinted blue) and marijuana "green" or "scen-
ery." But it was from past investigations that he
had learned that a "zipper" is an ounce of methamphet-

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,          7
      11-3146, 11-3319, 11-3321, 11-3367

amine and that "stepped on" means that a drug was cut
with adulterants to increase its weight and therefore (if
consumers don't realize that its weight is attributable to
adulterants) its price. The agent testified about "zipper"
and "stepped on" as an expert witness, but as a lay
witness about the other code words used by the con-
spirators in this case.

The defendants argue that the jury may have been
overawed by the agent's testimony about his long ex-
perience investigating drug conspiracies. The party
sponsoring an expert witness is entitled to lay his creden-
tials before the jury, but there is a danger that "the
jury might be smitten by an expert's 'aura of special
reliability' and therefore give his factual testimony
undue weight." *United States v. York*, 572 F.3d 415, 425
(7th Cir. 2008); see also *United States v. Upton*, 512 F.3d
394, 401 (7th Cir. 2008); *United States v. Flores-De-Jesus*,
569 F.3d 8, 20-21 (1st Cir. 2009). That was not a
realistic danger in this case. Had the agent been
testifying exclusively as a lay witness about the code
words he had learned the meaning of in the course of
his investigation of the defendants' conspiracy, it
would not have been improper to introduce him to the
jury as an experienced investigator, rather than a
novice listening to taped conversations of drug conspira-
tors for the first time, any more than it is improper to
ask an eyewitness whether he has good vision.

"Seamlessly switching back-and-forth between ex-
pert and fact testimony does little to stem the risks associ-

8          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                   11-3146, 11-3319, 11-3321, 11-3367

ated with dual-role witnesses." *United States v. York*, *supra*, 572 F.3d at 426. Telling the jury that a witness is both a lay witness *and* an expert witness and will be alternating between the two roles is potentially confusing—and unnecessary. The lawyer examining the witness need only ask him the basis for his answer to a question, and the witness will then explain whether it was his investigation of the defendants' conspiracy or his general experience in decoding drug code. That tells the jury what it needs to know in order to determine how much weight to give the testimony and tells opposing counsel what he needs to know in order to be able to cross-examine the witness effectively. Using terms like "lay witness" and "expert witness" and trying to explain to the jury the difference between the two types of witness is inessential and, it seems to us, ill advised.

   The judge, while allowing the prosecutor to elicit the fact that the agent had been determined in previous trials to be an expert on drug codes, told the jury that "when you hear a witness give an opinion about matters requiring special knowledge or skill, you should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean you are required to accept it. Give the testimony whatever weight you think it deserves, consider the reasons for the opinion, the witness's qualifications, and all of the other evidence in the case." That was an appropriate instruction.

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,          9
      11-3146, 11-3319, 11-3321, 11-3367

    We turn now to the issues specific to particular defendants. We begin with Phipps's complaint that he was merely a buyer of meth from the conspiracy and not a member of it. The government argues that since he told his supplier, who was a member, that he was a retail dealer, he must have agreed with the conspirators to sell the drugs he bought from them to his retail customers, and that by so agreeing he joined the conspiracy. On three occasions (out of the six for which there is evidence) the supplier "fronted" Phipps, that is, sold to him on credit rather than for cash, implying trust that the government argues would not have been bestowed on someone who was not a member of the conspiracy.

    Phipps argues that he never *agreed* with the drug ring to resell the drugs he bought from it even though both parties knew that he probably would be reselling at least some of them. He was a retail dealer. Reselling is what retailers, legal or illegal, do. And wholesalers know this. But knowledge of a buyer's intention to commit a crime with a supplier's goods doesn't imply an agreement between the buyer and the seller that the buyer do so. That knowledge, coupled with the supplier's having supplied the buyer with the means (in this case a supply of drugs) of committing the illegal act of retailing an illegal drug, could make him an aider and abettor of the buyer's crime but not, without more, a conspirator with the buyer. *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (plurality opinion); *United States v. Borelli, supra*, 336 F.2d at 384; *United*

10        Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                    11-3146, 11-3319, 11-3321, 11-3367

*States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940) (L. Hand, J.); but cf. *United States v. Boidi, supra*, 568 F.3d at 29-30; *United States v. Parker*, 554 F.3d 230, 236, 238-39 (2d Cir. 2009). Conspiracy is agreement, and it takes two to agree. "A person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider or abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone." *United States v. Lechuga, supra*, 994 F.2d at 349. If Phipps's supplier was indifferent to Phipps's intended use for the drugs, even if he knew that it was to resell them, he is merely an aider and abettor of Phipps's retail sale of illegal drugs and there was no conspiracy between them.

Not only is a sale by a wholesaler to a retailer consistent with an arms' length relationship rather than being proof of a conspiracy to resell the drugs; repeated transactions between a seller and a buyer are likewise consistent with such a relationship. *United States v. Colon*, 549 F.3d 565, 568-69 (7th Cir. 2008) ("if you buy from Wal-Mart your transactions will be highly regular and utterly standardized, but there will be no mutual trust suggestive of a relationship other than that of buyer and seller"); *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005); *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (per curiam). Neither selling in bulk nor repeat transactions distinguish a conspiracy involving wholesale and retail sales from an arms' length relationship between a wholesaler and a retailer, either in the market

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,       11
     11-3146, 11-3319, 11-3321, 11-3367

for illegal drugs or in markets for legal products and services.

In *United States v. Nunez, supra,* 673 F.3d at 664, we suggested that the line might be drawn "between 'contract' conceived of as a purely arm's-length relationship and 'conspiracy' conceived of as a cooperative relationship—a relationship of mutual assistance." See also *United States v. Speed,* 656 F.3d 714, 719 (7th Cir. 2011); *United States v. Townsend,* 924 F.2d 1385, 1392 (7th Cir. 1991). Pursuing that line of thought we distinguished between a spot contract, illustrated by a trade on a stock exchange, involving a minimal relationship because there is only the single transaction and the parties may not even be identified to each other, and the aptly named "relational contract," such as a longterm requirements contract, which creates a continuing relationship flexible enough to adapt to changes of circumstance that could not have been fully anticipated when the contract was negotiated. See Charles J. Goetz & Robert E. Scott, "Principles of Relational Contracts," 67 *Va. L. Rev.* 1089, 1092-95 (1981). So one way to understand a drug conspiracy would be as a relational contract among drug dealers. See *United States v. Lechuga, supra,* 994 F.2d at 349. But Phipps negotiated each meth purchase from the drug ring separately. The ring did not agree to supply Phipps with all his requirements of meth.

A variant or perhaps application of the relational-contract approach is to infer conspiracy from a sale *on credit* of illegal drugs in a quantity *too great* to be for personal

12          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                  11-3146, 11-3319, 11-3321, 11-3367

consumption. For then the wholesaler relies on his ex-
pectation that the retailer will repay the loan by com-
mitting the crime of selling the illegal drugs that he's
acquired, unless he thinks the buyer may not resell the
drugs after all and instead repay the loan from some
other source of income; maybe he is a "bulk pur-
chaser . . . planning to throw a huge party at which he
would serve his guests cocaine." *United States v. Lechuga*,
*supra*, 994 F.2d at 348. But that would be a very rare case.

Since the creditor of an illegal business cannot sue
his debtor, extending credit to him implies a significant
degree of trust by the creditor-seller and a commitment
by the debtor-buyer to resell the drugs so that he'll
have revenue from which to repay his creditor. *United
States v. Nunez*, *supra*, 673 F.3d at 665. As explained
in *United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th
Cir. 2000), "a dealer who 'fronts' drugs to his customer
depends for payment on the success of the resale
venture, making it possible to infer that the dealer has
agreed to participate in it: the dealer becomes at least a
debt investor in the redistribution venture, if not an
equity investor." The parties have agreed to the resale
of the drugs, and agreement to commit a criminal act is
a criminal conspiracy.

This approach, which infers conspiracy from wholesale
sales on credit, can be found in numerous cases in this
and other circuits (though usually it's presented as an
instance in which two factors of a multifactor test for
inferring a drug conspiracy—wholesales and credit—are

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,          13
    11-3146, 11-3319, 11-3321, 11-3367

present and suffice to satisfy the test). See, e.g., *United States v. Vallar*, 635 F.3d 271, 286-87 (7th Cir. 2011); *United States v. Johnson*, 592 F.3d 749, 756 n. 5 (7th Cir. 2010); *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009); *United States v. Colon*, *supra*, 549 F.3d at 568-70; *United States v. Rock*, 370 F.3d 712, 714-15 and n. 1 (7th Cir. 2004); *United States v. Ferguson*, 35 F.3d 327, 331 (7th Cir. 1994); *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994); *United States v. Lechuga*, *supra*, 994 F.2d at 349-50; *United States v. Parker*, *supra*, 554 F.3d at 238-39. The approach is a stripped-down alternative to the loose collections of factors explored in other conspiracy cases; in *United States v. Nunez*, *supra*, 673 F.3d at 666, we called it "a welcome simplification of doctrine" preferable to "trying to distinguish contract from conspiracy on the basis of 'plus' factors that seem mostly makeweights, such as mutual trust when it is just an inference from sales on credit." Our court and, again, other courts as well have expressed concern with the looseness of multifactor tests in other contexts. See *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788-89 (7th Cir. 2009); *Menard, Inc. v. Commissioner*, 560 F.3d 620, 622-23 (7th Cir. 2009); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012); *Barton v. U.S. District Court*, 410 F.3d 1104, 1108-09 (9th Cir. 2005); *USAir, Inc. v. Dept. of Transportation*, 969 F.2d 1256, 1263 (D.C. Cir. 1992). They are to be avoided if possible.

But the government, preferring a laundry list of factors indicative of conspiracy, does not argue for what we'll call the *Nunez-Torres* approach. It does cite *United States v.*

*Johnson*, *supra*, 592 F.3d at 755-56, but fails to mention footnote 5 of the opinion, the only place in it where the *Nunez-Torres* approach is actually articulated.

The quantity of meth sold to Phipps over a four-month period—five to twelve ounces—doesn't by itself establish that his supplier *knew* that Phipps would be reselling the meth rather than consuming it himself and relied on that knowledge in deciding to sell to him on credit. Each ounce of meth would have supplied at least 75 doses. *United States v. Cruz*, 680 F.3d 1261, 1262 (10th Cir. 2012); *United States v. Pruett*, 501 F.3d 976, 985 (8th Cir. 2007), vacated on other grounds, 552 U.S. 1241 (2008); *United States v. Ruiz*, 412 F.3d 871, 878 (8th Cir. 2005). But that means that five ounces of meth might yield only 375 doses, which is three a day over a four-month period (or even fewer if some is stored for later use). There was testimony that a meth addict consumes up to 1.5 grams a day, which would mean that one ounce would supply the addict's needs for only 18 days, and five ounces for 90 days—three months rather than four. Phipps was a dealer but also a serious meth addict, so it's possible that he could have consumed all the drugs he bought. He sometimes fell behind on paying for the meth that he obtained on credit, and his supplier, in contemplating further drug loans, worried that Phipps might instead consume the meth and that the payments from his construction business (his day job) would fail to materialize or be diverted by him to the purchase of additional drugs for consumption. It's possible therefore that Phipps was just an unreliable purchaser from the conspiracy rather

than a member of it. The government was skating on thin ice by failing to charge him with a substantive drug offense, for which the evidence was much stronger, rather than just with conspiracy.

Nevertheless his conviction must stand. The jury heard evidence that he indeed sold as well as consumed meth that he bought from the drug ring in quantity on credit. He was recorded asking his supplier for multiple ounces of meth on credit and seeking to assuage the supplier's fears about his creditworthiness by assuring him that he could resell it quickly to his customers, and he mentioned having done so in the past. At trial he testified that this was a ruse to obtain a large quantity of meth for his personal use, but the jury didn't have to believe him.

The jury instructions were repetitive and confusing, and included an open-ended list of factors from which membership in a conspiracy could be inferred: "whether the transactions involved large quantities of controlled substances; whether the parties had a standardized way of doing business over time; whether the parties had a continuing relationship; whether a defendant had a stake in the outcome of the conspiracy; whether the parties had an understanding that the controlled sub-stances would be resold; whether there existed a level of mutual trust between the parties; [and] any other factor you find relevant to your determination." Notice that the list includes wholesaling but not credit, except that the last item in the list could include anything. (This circuit's recently amended pattern jury instruc-

16          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                    11-3146, 11-3319, 11-3321, 11-3367

tions disapprove the laundry-list approach to inferring conspiracy. Seventh Circuit Pattern Jury Instructions 5.10A, Committee Comment, pp. 73-74 (2012); see also *United States v. Johnson, supra*, 592 F.3d at 758; *United States v. Colon, supra*, 549 F.3d at 570-71.) But in addition the judge instructed the jury that it could infer conspiracy from "selling large quantities of controlled substances on credit," or "repeatedly selling controlled substances on credit." Of course *Phipps* did not *sell* on credit; he was the buyer. But the jury could find that he knew that his supplier would not sell him wholesale quantities of drugs on credit unless he agreed to resell them, and by thus agreeing with his supplier to commit a crime (the resale of the illegal drugs) he became a conspirator.

Weir, a defendant who like Phipps was a retail dealer prosecuted only for conspiracy, complains mainly about the seizure of $6655 in cash found during a pat-down search following a police stop of a car in which he was a passenger, and subsequent testimony that the cash was proceeds of a drug sale. The police had stopped the car for a minor infraction—Weir's failure to wear his seatbelt—and discovered that the driver had no documentation of the car's registration or insurance and only an "open title" to the car, meaning that the previous owner had by signing the title relinquished ownership. And the license plates were registered to a different vehicle. There was no indication of who the new owner was, but it probably wasn't the driver.

The police made Weir step out of the car and patted him down—which was not improper, *Arizona v. Johnson,*

Nos.  11-2546, 11-2552, 11-2632, 11-2633, 11-2696,          17
    11-3146, 11-3319, 11-3321, 11-3367

555 U.S. 323, 331-32 (2009)—and discovered in one of his pockets a wad of bills and seized it. At trial Weir's girl-friend (the driver, who testified as a government witness in exchange for a lighter sentence) testified that the bills were indeed proceeds of a sale of drugs by him.

Weir argues that the seizure of the money violated the Fourth Amendment. At the time of the stop he was not suspected of any crime, and the mere fact of having thousands of dollars in cash on one's person has been held not to justify a seizure of it as suspected contraband or evidence of crime. *United States v. Sokolow*, 490 U.S. 1, 8-9 (1989); *United States v. $10,700.00 in U.S. Currency*, 258 F.3d 215, 232 (3d Cir. 2001); *United States v. $405,089.23 in U.S. Currency*, 122 F.3d 1285, 1290 (9th Cir. 1997); *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 285 (6th Cir. 1992). Law-abiding people sometimes carry large amounts of cash on their person; this is thought to be common enough to require evidence connecting the cash to a crime to establish probable cause for seizing the cash. See *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994); *United States v. Bustos-Torres*, 396 F.3d 935, 944-45 (8th Cir. 2005).

Two members of the conspiracy—the girlfriend and the supplier—testified that Weir was a drug dealer. But the testimony about the $6655 found on him may have carried special weight with the jury; that Weir had been carrying that amount of money was an undenied

18            Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                     11-3146, 11-3319, 11-3321, 11-3367

and undeniable fact rather than something the pair of
criminals who testified against him might have
fabricated to get lenient treatment by the authorities.
Whether the testimony about the cash was the
difference between conviction and acquittal of Weir is
very doubtful, however, and in any event his lawyer
failed to object. Because he did not object the govern-
ment had no opportunity to present evidence that the
seizure was a reasonable incident of the stop of the car.
The driver as we said had no proof of ownership, and
in fact the car had been reported stolen, as the police
discovered in the course of the traffic stop. They thus
had probable cause to believe that Weir was traveling
in a stolen car, and it was a reasonable surmise that
the large amount of cash found on him was related
in some way to the theft.

   In any event, the seizure of the money was inevitable.
The police impounded the car, as they were entitled
to do since the driver lacked proof of owning it or
otherwise being authorized to be driving it, and after im-
pounding the car they conducted a routine, unexception-
able inventory search that revealed the presence in the
car of digital scales, commonly used by drug dealers.
The scales (which were introduced in evidence at the
trial) would have also given the police probable cause
to believe that the cash they had seized was indeed
drug proceeds.

   As with Phipps, however, so with Weir, there is doubt
whether he was a member of the conspiracy. Like Phipps

he bought an ounce or two of meth at a time, sometimes paying in cash and sometimes on credit. He argues that he "did not conspire with anyone. He bought drugs in order to feed his own addiction. He sold some of those same drugs that he bought to get money to buy the drugs to feed his habit. . . . [H]e was not a conspirator." But as with Phipps, there was evidence that he purchased wholesale quantities of drugs on credit, agreeing to resell them in order to be able to repay his creditor.

Together with the other defendants who received life sentences as repeat drug offenders, 21 U.S.C. § 841(b)(1)(A), Weir complains that his life sentence was a cruel and unusual punishment. He argues that as a drug addict he belongs in a treatment facility rather than having to spend the rest of his life in prison. (The other defendants who received life sentences acknowledge controlling authority for the legality of their sentences in such decisions as *Ewing v. California*, 538 U.S. 11, 25 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991); *United States v. Speed*, 656 F.3d 714, 720 (7th Cir. 2011), and *United States v. Strahan*, 565 F.3d 1047, 1052-53 (7th Cir. 2009), and so reserve rather than argue their objections to their sentences.)

The sentencing guidelines recognize that criminals addicted to drugs are at risk for recidivism induced by their need to feed their habit. But the guidelines' suggested solution to the problem is for the judge to extend the post-incarceration period of supervised release, rather than to shorten the sentence. U.S.S.G. § 5H1.4;

20          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                   11-3146, 11-3319, 11-3321, 11-3367

*United States v. Tazhib*, 513 F.3d 692, 693-94 (7th Cir. 2008); *United States v. Williams*, 937 F.2d 979, 983 (5th Cir. 1991), overruled on other grounds by *United States v. Lambert*, 984 F.2d 658, 662 (5th Cir. 1993) (en banc). Concern that addiction makes recidivism more likely is an argument for treating the addiction rather than for giving the defendant a shorter sentence, something the guidelines therefore discourage. U.S.S.G. § 5H1.4 ("drug . . . dependence or abuse ordinarily is not a reason for a downward departure"); *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646-47 (7th Cir. 2007); *United States v. Wurzinger*, 467 F.3d 649, 654 (7th Cir. 2006). It is rightly discouraged; anything that increases the risk of recidivism argues for a longer sentence.

Defendant Moreland was convicted only of being a felon in unauthorized possession of a gun. He complains about the judge's having mistakenly read to the jury a set of instructions containing a copy of the indictment that included a list of his felonies—despite his having stipulated that he was a felon in order to keep the details of his prior convictions from the jury. See *Old Chief v. United States*, 519 U.S. 172 (1997).

The judge had given the jurors a copy of the jury instructions containing the indictment before the closing argument so that the lawyers could refer the jurors to specific language and they could read along. Through a slip-up the version of the jury instructions placed on the jurors' seats in the jury box when they convened to hear the closing arguments contained the original indict-

ment rather than a version from which the record of Moreland's prior felonies had been excised. The closing arguments lasted two days. The trial recessed for the weekend and when the jury reassembled on Monday the judge read them the unredacted instructions. After reading the portion of the indictment that recited Moreland's prior felony convictions, the judge realized her mistake, collected the instructions, and gave the jurors new copies containing the redacted indictment to take back with them to the jury room for their deliberations.

As the evidence of Moreland's guilt was overwhelming, the error in revealing his previous felonies to the jury was harmless—and for the additional reason that those felonies (multiple drug-related felonies, resisting law enforcement, criminal recklessness, and receipt of stolen property) did not mention guns. This implies that had the jury been poisoned by learning of Moreland's crimes it would have convicted him of the drug conspiracy rather than of the gun crime. Instead it acquitted him of the former and convicted him of the latter.

Defendant Antrio Hammond makes the same argument as Moreland, but unlike Moreland he was convicted of participating in the drug conspiracy, and so the listing in the indictment of his prior felonies, which were drug-related, created a greater risk than in Moreland's case that the jury may have convicted him because he had demonstrated a propensity for committing drug crimes. But the evidence that he was a

central player in the conspiracy charged in this case was overwhelming. The judge never read his prior felonies to the jury, moreover, as she had done with Moreland's prior felonies, and there is no indication that any juror, reading ahead in the indictment, discovered the nature of Hammond's prior felonies before the judge confiscated the unredacted version of the indictment.

Hammond's lawyer asked the judge to voir dire the jury to determine whether any jurors had read that version. The judge rightly refused, given the unlikelihood that any juror had read ahead and discovered the felonies and the concern that asking the jurors whether they had done so might make them think that the judge or the lawyers were trying to hide something important—some key part of the indictment—from them. Cf. *United States v. Reynolds*, 189 F.3d 521, 527-28 (7th Cir. 1999); *United States v. Magana*, 118 F.3d 1173, 1184-85 (7th Cir. 1997); *United States v. Williams*, 822 F.2d 1174, 1189 (D.C. Cir. 1987).

Bradley Shelton received a sentencing enhancement for possessing a gun in connection with a drug offense. U.S.S.G. § 2D1.1(b)(1). "Possession" and "connection" can be tricky, see, e.g., *United States v. Morris*, 977 F.2d 617, 621-23 (D.C. Cir. 1992), but not in this case. Shelton told his sister—who had noticed police activity outside her home, where two months earlier Shelton had delivered meth to a customer—to conceal a gun along with drugs in the false ceiling of her residence. (A false or dropped ceiling is a secondary ceiling hung below the structural

ceiling, and it creates a space in which an object can be concealed, although that is not the usual purpose—the usual purpose is to conceal pipes or other equipment, improve acoustic balance or ventilation, or enhance a room's interior design.) Shelton owned the gun, had access to the house and the gun, and thus possessed it even though it wasn't in his physical custody at all times, *United States v. Perez*, 581 F.3d 539, 546 (7th Cir. 2009); *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005), just as one possesses one's refrigerator even when one is not in one's kitchen. And Shelton possessed the gun in connection with his role in the drug conspiracy, of which he was a continuing member, never having withdrawn from it. *United States v. Womack*, 496 F.3d 791, 797-98 (7th Cir. 2007); *United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003); *United States v. Caicedo*, 103 F.3d 410, 412 (5th Cir. 1997).

He attacks his life sentence on the ground that the prior drug felonies that qualified him for such a sentence were not separate criminal episodes, as 21 U.S.C. § 841(b)(1)(A) has been glossed to require. *United States v. Arreola-Castillo*, 539 F.3d 700, 705 (7th Cir. 2008); *United States v. Beckstrom*, 647 F.3d 1012, 1017 (10th Cir. 2011); *United States v. Powell*, 404 F.3d 678, 682 (2d Cir. 2005); *United States v. Barr*, 130 F.3d 711, 712 (5th Cir. 1997); *United States v. Rice*, 43 F.3d 601, 605-06 (11th Cir. 1995). The first felony was the sale of Xanax to a confidential informant, the second, a day later, possession of marijuana found when Shelton was arrested for the Xanax sale, and the third, six days later, also possession of marijuana, this

24          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                  11-3146, 11-3319, 11-3321, 11-3367

time while he was in jail. The first and second offenses clearly were separate from each other; they involved different drugs possessed on different days. See, e.g., *United States v. Beckstrom*, *supra*, 647 F.3d at 1018; *United States v. Fink*, 499 F.3d 81, 88 (1st Cir. 2007); *United States v. Gray*, 152 F.3d 816, 821 (8th Cir. 1998). But the second and third offenses—the marijuana offenses—may not have been separate. The marijuana found in his cell may have been on his person when he was arrested for selling Xanax and may just have been missed in the initial search. He contends that had the police done a more careful search when they arrested him they would have found it all, and so there would have been only one offense of possession of marijuana. A careless police search should not increase a defendant's sentence. But if the second marijuana offense is therefore ignored, Shelton still has two prior drug felonies (one for selling Xanax, one for possessing marijuana), and 21 U.S.C. § 841(b)(1)(A) imposes a mandatory life sentence on a defendant who has been convicted of two or more previous drug felonies.

Finally, defendant Smith, given a sentencing discount as a minor participant, argues that she qualified as a minimal participant, which by knocking two additional levels off her base offense level would have reduced her guidelines range of 151-188 months to 121-151 months. See U.S.S.G. § 3B1.2, Application Notes 4 and 5. The judge sentenced her at the bottom of the minor-participant range, that is, to 151 months. Her argument for a minimal-

participant discount is frivolous; the minor-participant discount that she received was a gift—and quite a large one, as it effectively halved her guidelines range, from 292-365 months to 151-188 months—to which she was not entitled (for she was in fact a major participant), although the government has not cross-appealed.

A minimal participant is a "defendant who [is] plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, Application Note 4. Smith stored large quantities of meth and money at her residence (a police search recovered nearly $81,000 from a safe) and had firearms to defend the stash in aid of the drug conspiracy of her sons Wesley and Antrio Hammond. She assisted them in deliveries of meth and the collection of sale proceeds. She discussed with Wesley in jail delivering guns to enable the conspiracy to intimidate a rival gang. She relayed to him news that Timothy Bailey, a co-conspirator, had been arrested, and she warned Wesley not to try to call Bailey on his cellphone because the police probably had seized the cellphone and would answer it if it rang.

Smith asks for mercy mainly because of the family relationship, though she also cites her age (59) and ill health (one of her kidneys has been removed because of cancer). *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009); *United States v. Theunick*, 651 F.3d 578, 592 (6th Cir. 2011). She lacks a compelling case under either the guide-lines or the sentencing factors in 18 U.S.C. § 3553(a) for leniency on either count. The guidelines provide

26          Nos. 11-2546, 11-2552, 11-2632, 11-2633, 11-2696,
                   11-3146, 11-3319, 11-3321, 11-3367

a discount for "familial relationships," U.S.S.G.
§ 2D1.1(b)(15)(A), but it is limited to defendants
who receive a minimal-participant discount, as she did
not; and such a discount is anyway inappropriate for a
mother actively engaged with her adult sons in felonious
conspiracies. As for age and infirmity (see 18 U.S.C.
§ 3553(a)(2)(D); U.S.S.G. §§ 5H1.1, 5H1.4), age 59 is not
elderly in our society; the elderly do not have a license
to commit crime, *United States v. Johnson*, 685 F.3d 660,
662 (7th Cir. 2012); and adequate medical care is
available in federal prisons. *United States v. Theunick, supra*,
651 F.3d at 592.

   The judgments are

                                           AFFIRMED.

In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy

Teste:

_[signature]_

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

---

No. 11-3321

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL D. WEIR,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:10-cr-00007-JMS-CMM-27—**Jane E. Magnus-Stinson**, *Judge.*

---

ON PETITION FOR REHEARING AND REHEARING EN BANC—
JANUARY 9, 2013

---

Before POSNER, ROVNER and SYKES, *Circuit Judges.*

On December 14, 2012, defendant-appellant filed a petition for rehearing and petition for rehearing *en banc.* All the judges on the original panel have voted to deny the petition for rehearing and no judge in regular active service asked for a vote on the petition for rehearing *en banc.*\* The petition is therefore DENIED.

---

\* Circuit Judge John Daniel Tinder did not participate in the consideration of this petition for rehearing *en banc.*

2                                                        No. 11-3321

ROVNER, *Circuit Judge*, concurring in the denial of re-hearing. Michael D. Weir complains that his Fourth Amendment rights were violated when a police officer seized $6,655 from him during a traffic stop. Because his trial counsel never objected to the seizure or to the introduction of evidence obtained as a result of the seizure, our review is for plain error. *United States v. Kelly*, 519 F.3d 355, 361 n.1 (7th Cir. 2008).

To briefly review the facts of the seizure, the officer stopped the car because Weir, a front-seat passenger, was not wearing his seat belt. The officer immediately ascertained that the driver lacked valid registration documents or proof of insurance for the car. She possessed only an open title. She told the officer that the license plates came from a different car, although she could not say where they came from. On this basis, the officer decided to impound the car. He ordered the other passengers out of the vehicle and asked them if they possessed any weapons. At this point, Weir told the officer that he had a pocketknife. The officer conducted a pat-down search and removed the small pocketknife from the pocket of Weir's trousers. Up to this point, Weir has no viable objection to the legitimate traffic stop or the officer's routine *Terry* pat-down for a weapon that Weir conceded he possessed.

But in the course of the pat-down, the officer also felt an object in Weir's pocket that he immediately believed was a large sum of money. R. 74-15, Tr. at 671. Although we have repeatedly held that mere possession of a large amount of cash does not justify seizure of the money as contraband or evidence of a crime, *see United States v.*

No. 11-3321                                                    3

*Moreland*, 2012 WL 5992122, *8 (7th Cir. Dec. 3, 2012), the officer removed the money from Weir's pocket, counted it, and seized it. As the traffic stop progressed, the officer and other backup officers determined both that the car had been reported stolen and that there were digital scales in the car that could be characterized as drug paraphernalia. The driver of the car was therefore arrested and charged with possession of drug paraphernalia and possession of stolen property. But Weir was allowed to leave the scene. R. 74-15, *passim*. The driver, though, later implicated Weir in a drug conspiracy, claiming that the money in his pocket was the proceeds of drug transactions. This led to Weir's arrest, and Weir then implicated himself further. None of this would have happened, Weir complains, if the officer had not wrongfully seized the cash from his pocket.

I agree with Weir that the officer did not have probable cause to seize the cash at the time the officer effected the seizure.

> A warrantless seizure of an object is justified if: "(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.' " *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004). "For the incriminating nature to be immediately apparent, the officer must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *Id.* at 624.

*United States v. Schmidt*, 700 F.3d 934, 938, 39 (7th Cir. 2012). It is difficult to discern from the record the sequence

and timing of the events as they unfolded during the traffic stop and subsequent search of the car. The record is simply undeveloped on when the officers learned that the car was reported stolen, and when they discovered the digital scales relative to when they seized the money from Weir. The most reasonable reading of the officer's testimony is that the officer seized the cash before knowing that the car was stolen or that there was drug paraphernalia in the car. The officer also testified that he did not know to whom the scales belonged. That Weir was allowed to leave when the driver was arrested for possessing the scales and the stolen car demonstrates that the officers did not, at that time, tie the scales or the car to Weir. In any case, the only theory advanced by the government to justify the seizure was that the contraband nature of the money was "immediately apparent" when the officer felt the object in Weir's pocket.

The panel opinion (*Moreland*, 2012 WL 5992122, at *8) rightly rejects that rationale on the basis of a long line of cases holding that money alone is not contraband. The incriminating nature of cash is not immediately apparent unless there is some additional evidence connecting that cash to criminal activity; thus only some evidence establishing such a nexus could have justified the warrantless seizure of that money. The opinion concludes that the officers could seize the money because Weir was the passenger in a stolen car, and because they later discovered the digital scales in that car. But at the time the officer seized the cash, the officer had no evidence connecting Weir or the cash to criminal activity. That the officer later learned that the car was stolen and that it con-

No. 11-3321                                          5

tained drug paraphernalia cannot retroactively justify the seizure.

We assess probable cause for a seizure at the time the seizure occurred. *See Anderer v. Jones*, 385 F.3d 1043, 1051 n.11 (7th Cir. 2004) (we review probable cause determinations based on the information available to the police officer at the time of the arrest). And to my mind, Weir's presence in the car is simply not enough to give rise to probable cause. Reasonable suspicion, perhaps—and thus grounds to continue questioning Weir under *Terry*—but not probable cause to seize the cash.

I concur in the denial of rehearing, however, because it was not the seizu*r*e of the cash *per se* that initiated the chain of events that incriminated Weir. It was the *discovery* of the cash that led to Weir's downfall, and Weir has no viable objections to the events leading to the discovery of the cash. Once the officers knew that Weir possessed a large sum of money, they had a basis to ask the driver about Weir's possible involvement in any drug-related activity. The driver would have implicated Weir whether or not the police physically possessed the cash they discovered in his pocket. The driver cooperated with the government in order to procure a lighter sentence for herself; it is doubtful that she cared whether the police were holding the cash when they asked her about Weir. Weir would have been arrested and would have further implicated himself. That chain of events would have been no different whether the cash was seized or simply discovered. The evidence used to convict Weir would have been virtually identical.

The officer testified at trial regarding the money found in Weir's pocket. So inconsequential was the physical stack of cash that the government never sought to introduce it as evidence at trial.

So even if the seizure of the cash was error, it was not plain error. Before we will reverse for plain error, we must find (1) that there is error, (2) that it is plain, and (3) that it affects substantial rights. *United States v. Thornton*, 642 F.3d 599, 605 (7th Cir. 2011). "Once these three conditions have been met, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006). The defendant bears the burden of establishing that the error affected substantial rights by demonstrating that the outcome probably would have been different without the error. *Id*. As I have just demonstrated, the outcome would have been the same whether or not the officer seized the cash. Once the cash was legitimately discovered, *alea iacta est*. I therefore concur in the denial of the petition for rehearing, but I do not endorse the rationale used in the opinion to justify the seizure.